UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| TD BANKNORTH INSURANCE | ) | |
| AGENCY, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 07-170-P-H |
| | ) | |
| MILA KOFMAN, in her official capacity as | ) | |
| Superintendent of the Bureau of Insurance | ) | |
| of the Department of Professional and | ) | |
| Financial Regulation of the State of Maine, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDED DECISION ON CROSS-MOTIONS
FOR JUDGMENT ON A STIPULATED RECORD**

The Maine Insurance Code prohibits licensed insurance agents and brokers from

engaging in certain practices deemed harmful to consumer interests.  It also prohibits entities

engaged in the business of financing the purchase of property from engaging in certain

insurance-related practices.  Thus, a bank or other lender is prohibited from requiring a loan

applicant to purchase insurance from a particular insurance company, such as an insurance

company owned by or affiliated with the lender.  24-A M.R.S. § 2168.  Related to this provision

is the provision challenged in this case, one that prohibits a lender or its affiliated insurance

company from target marketing insurance products to an individual requesting a loan from the

lender, until the lender sends notice to the applicant of its decision on the application or has

internally documented its decision in writing.  Id. § 2168-B.  For example, by operation of this

law, Plaintiff TD Banknorth Insurance Agency, a wholly-owned direct financial subsidiary of

Plaintiff TD Bank NA, cannot solicit auto insurance or home insurance from a person who has

applied to TD Bank for a car loan or mortgage before TD Bank has documented its decision to approve the loan application, unless it can be shown that the solicitation arose from general insurance sales and marketing activity that was not "specifically directed toward purchasers or borrowers" who applied at TD Bank for credit.  Id. § 2168-B(1).

In this civil action the plaintiffs have sued the Superintendent of the Maine Bureau of Insurance requesting declaratory and injunctive relief invalidating the restriction on solicitations set out in section 2168-B of the Maine Insurance Code on the ground that it is preempted by the Gramm-Leach-Bliley Act of 1999, 15 U.S.C. §§ 6701 et seq., which bars state regulation that prevents or significantly interferes with the ability of national banks or their affiliates to engage in insurance sales, solicitation, or crossmarketing activity.  Id. § 6701(d)(2)(A).  By extension, Plaintiffs Kennebunk Savings Bank and its wholly-owned subsidiary, Morris Insurance Services, Inc., ask that the prohibition be stricken down as applied to Maine chartered banks and their affiliates, pursuant to 9-B M.R.S. § 416.

The dispute is now before the Court on cross-motions for judgment on a stipulated record.  (See Doc. Nos. 25 & 26.)  The Court referred the pending motions to me for a report and recommended decision.  Based on my review of the stipulated record and the parties' legal memoranda, I recommend that the Court grant the declaratory and injunctive relief requested by the plaintiffs.

### Justiciability

This case arises out of a controversy between the plaintiff banking and insurance entities and the defendant Commissioner, whose office has cautioned the plaintiffs that any unilateral attempt to engage in the allegedly preempted activity will result in enforcement action by the defendant.  The plaintiffs are desirous of a declaration from the Court that will remove the

2

obstacle presented by the defendant's promise of enforcement action.  The threat of enforcement action by the defendant is sufficient to generate a justiciable conflict because it imposes a legal and practical constraint on a valuable legal right asserted by the plaintiffs.  See Ry. Mail Ass'n v. Corsi, 326 U.S. 88, 93 (1945) (collecting cases); and compare Bowler v. Hawke, 320 F.3d 59, 63 (1st Cir. 2003) (concluding that a justiciable controversy did not arise between the Commissioner of Insurance of the Commonwealth of Massachusetts and the Comptroller of the Currency of the United States based on an opinion letter written by the latter offering guidance to banks and related entities in regard to the legitimacy of certain Massachusetts insurance regulations, because the letter did not amount to a conflicting regulation), with Mass. Bankers Assoc. v. Bowler, 392 F. Supp. 2d 24 (D. Mass. 2005) (resolving the dispute in a subsequent action commenced by the banking entities against the Commissioner).

### Stipulated Facts

The parties have agreed to have the Court resolve their dispute based on a stipulated record.  They stipulate that the following facts are undisputed:

1.      TD Bank, N.A. ("TD Bank") is a national banking association organized and existing under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*

2.      TD Bank maintains its main office and principal place of business in Delaware.

3.      As of February 14, 2008, TD Bank operated 616 bank branches in the following states (excluding its one foreign office in the Cayman Islands):

        Connecticut – 82 branches
        Maine – 61 branches
        Massachusetts – 165 branches
        New Hampshire – 74 branches
        New Jersey – 113 branches
        New York – 59 branches
        Pennsylvania – 24 branches

3

Vermont – 38 branches

4.      TD Banknorth Insurance Agency, Inc. ("TD Banknorth Insurance") is a wholly-owned

direct financial subsidiary of TD Bank.

5.      TD Banknorth Insurance sells insurance to the general public;  its customer base is not

limited exclusively to TD Bank customers.

6.      TD Banknorth Insurance maintains its main office and principal place of business at 75

John Roberts Road, South Portland, Maine.

7.      TD Banknorth Insurance has one office in Connecticut, five offices in Maine, three

offices in Massachusetts, four offices in New Hampshire, and two offices in New York.

8.      TD Banknorth Insurance has individual licensed producers and other employees assigned

to its offices in Maine.

9.      TD Banknorth Insurance and/or its individual producers have licenses to sell

insurance in every state except Alaska, Hawaii, New Mexico, North Dakota, South

Dakota, and Wyoming.

10.     TD Banknorth Insurance is licensed as a Resident Producer Business Entity and is thus

authorized to sell general lines of insurance in Maine.

11.     TD Banknorth Insurance sells an assortment of insurance products, including

homeowner's, renter's, motor vehicle, personal property, umbrella, employee benefits (*e.g*.,

employee health, life insurance, disability, etc.), workers' compensation, commercial general

liability, errors and omissions (malpractice) and business interruption policies.

12.     Kennebunk Savings Bank ("Kennebunk Savings") is a Maine banking

corporation.

13.     Kennebunk Savings maintains its main office and principal place of business at 104 Main Street, Kennebunk, Maine.

14.     Kennebunk Savings operates approximately 14 branches in Maine.

15.     Morris Insurance Services, Inc. ("Morris Insurance") is a wholly-owned direct subsidiary of Kennebunk Savings.

16.     Morris Insurance sells insurance products in Maine.

17.     Morris Insurance maintains its main office and principal place of business at 50 Portland Road, Kennebunk, Maine.

18.     Morris Insurance has producers and other employees at its offices in Maine.

19.     Morris Insurance is authorized to sell general lines of insurance in Maine.

20.     Mila Kofman is the Superintendent of the Maine Bureau of Insurance of the Department of Professional and Financial Regulation of the State of Maine.

21.     Mila Kofman is the state official charged with the administration of laws regulating the business of insurance in Maine.

22.     Over the past several years, Plaintiffs have joined a national trend among banks to provide customers with a broader range of financial services and products than traditional deposit and loan products, such that, in addition to traditional commercial and retail banking services, Plaintiffs now offer customers a variety of investment management services and insurance products.

23.     Plaintiffs' non-lender-owned or affiliated ("non-lender") competitors are not subject to the restrictions and prohibitions set forth in 24-A M.R.S. § 2168-B (the "Waiting Period Statute").  A lender-owned or affiliated insurance agency is not subject to the Waiting

5

Period Statute if the person being solicited applied for credit with a lender other than the one that owns or is affiliated with the insurance agency.

24.     Such non-lender competitors include "affiliation" organizations such as AAA, which may offer homeowner's insurance, and may refer their members to third party lenders for mortgages and home equity loans.

25.     TD Bank and Kennebunk Savings (together "Bank Plaintiffs") wish to promote active employee sales and referral programs for insurance as well as other financial products, and therefore encourage bank employees, including tellers, customer service representatives and branch managers, to alert banking customers to the availability of other products and services.

26.     Bank Plaintiffs have trained their employees to identify cross-marketing and referral opportunities, and to make referrals where appropriate.  Bank Plaintiffs encourage their employees to refer banking customers to their insurance subsidiaries, except during the "Waiting Period" with respect to those customers who have applied for a loan.

27.     TD Bank serves approximately 229,000 households in Maine.

28.     From 2004 through 2007 in Maine, TD Bank provided a total of approximately 6,967 "qualified retail referrals" to its subsidiary, TD Banknorth Insurance.

29.     A retail referral is a referral by a bank employee (usually at a bank branch) to TD Banknorth Insurance of a bank customer who has expressed to the employee an interest in obtaining insurance.  The bank employee then provides the customer's contact information to TD Banknorth Insurance so that it can follow up with the customer.  The retail referral becomes "qualified" once the contact information has been properly entered into the computer system and verified through a communication with the person.

30.     From 2004 through 2007, TD Banknorth Insurance sold insurance products or services to approximately 1,788 of the qualified retail referrals in Maine described in Paragraph 29, above, resulting in a "success rate" of approximately 26% for qualified retail referrals.

31.     In 2006, TD Bank provided 940 qualified retail referrals to its subsidiary, TD Banknorth Insurance.  TD Banknorth Insurance sold insurance products or services to approximately 403 of these qualified retail referrals, resulting in a "success rate" of approximately 43% for qualified retail referrals.

32.     Of the insurance sales resulting from the qualified retail referrals described above, approximately 60 percent were motor vehicle insurance policies, 35 percent were homeowner's policies, one percent was umbrella policies, and four percent were other kinds of policies.

33.     Twice each week, TD Bank sends mortgage referral leads to TD Banknorth Insurance.  Mortgage referral leads are persons who have been approved for residential mortgages that have been underwritten by TD Bank or a third party processor pursuant to a mortgage marketing agreement with TD Bank.

34.     TD Banknorth Insurance solicits mortgage applicants based upon mortgage referral leads provided by TD Bank.  Before TD Bank provides the leads to TD Banknorth Insurance, existing customers of TD Banknorth Insurance and persons listed in TD Bank's "Do-Not-Contact" list are screened out and excluded from the data feed.

35.     From 2004 through 2007 in Maine, TD Banknorth Insurance solicited approximately 2,420 mortgage applicants through mortgage referral leads provided by TD Bank.

36.     From 2004 through 2007 in Maine, TD Banknorth Insurance sold insurance

7

products or services to approximately 311 of the mortgage applicants who had been solicited through referral leads provided by TD Bank as described in Paragraph 35, above, resulting in a "success rate" of approximately 13% for such mortgage referrals.

37.     In 2006 in Maine, TD Banknorth Insurance solicited approximately 538 mortgage applicants through mortgage referral leads provided by TD Bank.  TD Banknorth Insurance sold insurance products or services to approximately 49 of these mortgage applicants, resulting in a "success rate" of approximately 9% for such mortgage referrals.

38.     In 2007 in Maine, TD Banknorth Insurance solicited approximately 409 mortgage applicants through mortgage referral leads provided by TD Bank.  TD Banknorth Insurance sold insurance products or services to 93 of these mortgage applicants, resulting in a "success rate" of approximately 23% for such mortgage referrals.

39.     Of the mortgage applicants referred to in paragraphs 35, 37, and 38, approximately 52 percent were persons applying to refinance existing mortgages, and approximately 48 percent were persons applying for initial mortgages.

40.     Other than what is already included in this stipulated record, TD Bank has no additional information indicating whether more mortgage applicants obtain homeowner's insurance before being approved for the mortgage or more mortgage applicants obtain homeowner's insurance after being approved for the mortgage.

41.     When TD Banknorth Insurance contacts a mortgage referral lead in an effort to market insurance, and the effort is unsuccessful, TD Banknorth Insurance generally does not regularly and uniformly document the reason that the effort was unsuccessful.  Thus, TD Banknorth Insurance does not have comprehensive documentation reflecting the number of mortgage referral leads who did not obtain insurance from TD Banknorth Insurance because they already

had procured insurance.  Similarly, TD Banknorth Insurance does not have comprehensive documentation reflecting the number of mortgage referral leads who did not obtain insurance from TD Banknorth Insurance for reasons other than that they had already procured insurance.

42.     Neither TD Banknorth Insurance nor TD Bank tracks the number of persons who both obtained residential mortgages from TD Bank and obtained their homeowner's insurance policies from TD Banknorth Insurance.  Thus, they do not know how many persons who obtained residential mortgages from TD Bank obtained their homeowner's insurance policies from TD Banknorth Insurance prior to being solicited by TD Banknorth Insurance through the mortgage referral lead process.

43.     TD Bank engages in residential mortgage lending through two primary avenues, direct in-house applications and applications to a third-party underwriter (PHH) that transfers the loans to TD Bank after the loans have been approved and closed.

44.     PHH conducts its underwriting pursuant to a contract with TD Bank, and provides mortgage referral leads to TD Bank/TD Banknorth Insurance Agency as part of that process.  PHH provides a data feed of mortgage applicants whose loans have been approved.

45.     The following are the numbers of Maine residential mortgage loans received and processed by PHH and subsequently transferred to TD Bank in 2005 (when TD Bank commenced the PHH lending program) and in 2006 and 2007.

| Year | Applications | Approved | Denied | Withdrawn |
|------|-------------|----------|--------|-----------|
| 2005 | 48 | 36 | 7 | 5 |
| 2006 | 1,081 | 804 | 208 | 69 |
| 2007 | 1,059 | 821 | 211 | 27 |

46.     The following are the numbers of mortgage applications submitted directly to, and acted upon by, TD Bank in Maine.

9

| Year | Applications | Approved | Denied | Withdrawn |
|------|--------------|----------|--------|-----------|
| 2004 | 1,250 | 1,041 | 160 | 49 |
| 2005 | 1,764 | 1,397 | 264 | 103 |
| 2006 | 407 | 282 | 106 | 19 |
| 2007 | 534 | 319 | 195 | 20 |

47.     In 2004, 2005, 2006, and 2007, it took TD Bank an average of 9.5 days to approve a direct residential mortgage loan application and 16.9 days to deny such an application.

48.     The vast majority of TD Bank's automotive lending is conducted on an indirect basis – the loans are documented by automotive dealers with underwriting support from TD Bank, and then immediately transferred to TD Bank by those dealers.

49.     The following are the number of indirect automotive loans applied for and approved or countered, (*i.e.*, a loan was offered on different terms) in Maine in the last four years:

| Year | Applications Received | Applications Approved/Countered |
|------|-----------------------|--------------------------------|
| 2004 | 25,429 | 15,578 |
| 2005 | 28,546 | 18,291 |
| 2006 | 28,252 | 17,667 |
| 2007 | 29,175 | 17,916 |

50.     The following are the number of direct automotive loans applied for and approved or countered in Maine in the last four years:

| Year | Applications Received | Applications Approved/ Countered |
|------|-----------------------|---------------------------------|
| 2004 | 2,482 | 644 |
| 2005 | 2,366 | 530 |
| 2006 | 2,093 | 432 |
| 2007 | 1,854 | 408 |

51.     For the last four years, the average time it took TD Bank to approve indirect and direct motor vehicle loans was as follows:

2004:  15 minutes
2005:  15 minutes

2006:  13 minutes
2007:  11 minutes

52.     TD Bank does not currently have a program to refer direct or indirect automotive loan applicants to TD Banknorth Insurance for the marketing of motor vehicle policies.

53.     TD Bank does not track or have reliable statistics regarding the number of persons who obtained their motor vehicle policies from TD Banknorth Insurance and also obtained their motor vehicle loans from TD Bank.

54.     In 2003, TD Bank was one of a group of plaintiffs that brought a lawsuit in the United States District Court for the District of Massachusetts claiming that a Massachusetts statute (Mass. Gen. Laws ch. 167F, § 2A), which imposes certain restrictions on the extent to which banks may sell, solicit and market insurance products, was preempted by the Gramm-Leach-Bliley Act of 1999.  See Massachusetts Bankers Assoc. v. Bowler, No. 03-11522-RWZ (D. Mass. 2003).

55.     In the Massachusetts case, TD Bank stated that its banking operations in Maine, New Hampshire and Vermont referred bank customers to TD Banknorth Insurance for sales of insurance products, but its operations in those states were not subject to the prohibitions and restrictions set forth in Mass. Gen. Laws ch. 167F, § 2A.  TD Bank further stated that in those three states, it actively referred its banking customers to its insurance affiliates, and those referrals resulted in a significant number of sales.

56.     On July 11, 2002, TD Bank submitted an amicus brief to the First Circuit in the matter of Bowler v. Hawke, No. 02-1738.  In the brief, TD Bank stated:  "Banknorth is heavily invested in the insurance agency business, with subsidiary insurance agency operations (the "Banknorth Agencies") in Massachusetts, Vermont, New Hampshire, Maine, and Connecticut."

11

57.     In its July 11, 2002 brief, TD Bank further stated:

> Currently, Banknorth's insurance marketing program does not target cross-marketing of homeowner's insurance to mortgage loan applicants until after the loan application has been approved and the loan commitment has been accepted by the applicant.  This extended delay in the cross-marketing of insurance to loan applicants is intended to comply with a third provision of Massachusetts law at issue in this case (the "Waiting Period Rule" described in Note 2, infra) that prohibits a bank and its affiliated insurance agencies from marketing insurance to a mortgage loan applicant before the application has been approved and the applicant has accepted the bank's loan commitment.  Among the states where the Bank Agencies conduct business, Massachusetts' Waiting Period Rule is unique; none of the other States requires such an extended delay before Banknorth and the Banknorth Agencies can cross-market insurance to mortgage loan applicants.

58.     This is because, before the Massachusetts Waiting Period Rule was overturned by the United States District Court for the District of Massachusetts, see Massachusetts Bankers Assoc. v. Bowler, 392 F. Supp. 2d 24 (D. Mass. 2005), that Waiting Period Rule prohibited banks from soliciting a mortgage applicant for insurance until the applicant's mortgage application was approved, the approval and certain required disclosures were provided to the applicant in writing, the receipt of both the approval and disclosures were acknowledged in writing by the applicant, and the applicant accepted the bank's mortgage commitment.  See Mass. Gen. Laws ch. 167F, § 2A(4)(ii)-(iii).  In contrast, 24-A M.R.S. § 2168-B permits solicitation of a mortgage applicant after the bank "has documented in writing . . . its action on the application," and therefore does not require that the bank wait until it has notified the applicant of its action, and the applicant has accepted the mortgage commitment, before soliciting that applicant for insurance.

59.     Of the eight states in which TD Bank has branches, no state other than Maine imposes a waiting period on the solicitation of insurance similar to the one that Maine imposes pursuant to 24-A M.R.S. § 2168-B.

60.     Despite the fact that no other state imposes a waiting period, TD Bank does not in any state engage in the targeted solicitation of insurance applications from consumer loan applicants insofar as such solicitation might be deemed to violate 24-A M.R.S. § 2168-B if such solicitation occurred in Maine.

61.     TD Bank has voluntarily imposed upon itself a waiting period in the other states because it has determined that it would be impractical, undesirable and expensive to develop, implement, and maintain one referral program for Maine, and a separate referral program for those other states that do not impose a waiting period.

62.     TD Bank has no documents concerning its determination that it would be impractical, undesirable and expensive to develop, implement, and maintain one referral program for Maine, and a separate referral program for those other states that do not impose a waiting period.

63.     TD Bank has not conducted any formal studies regarding the added expense of maintaining two separate referral programs.

64.     Kennebunk Savings serves approximately 28,566 retail households in Maine.

65.     Kennebunk Savings only engages in "permission marketing" (that is, a customer must agree in order to be referred to Morris Insurance) to both its customers who hold loans with Kennebunk Savings and its customers who do not hold loans.

66.     Kennebunk Savings has approximately 29,661 account relationships with customers who do not hold loans with Kennebunk Savings.

67.     Kennebunk Savings has referred approximately 3,079 of its customers who do not hold loans to Morris Insurance, for a referral rate of approximately 10%.

68.     Kennebunk Savings serves approximately 5,157 loan customers.

69.     Kennebunk Savings has referred approximately 135 of its loan customers to

Morris Insurance, for a referral rate of approximately 2%.

70.     Many of Bank Plaintiffs' loan applicants and loan customers are potential

purchasers of insurance products from TD Banknorth Insurance and Morris Insurance (together

"the Insurance Agency Plaintiffs").

71.     The Waiting Period Statute, 24-A M.R.S. § 2168-B (2007), applies to TD

Bank's subsidiary, TD Banknorth Insurance, and to Kennebunk Savings' subsidiary, Morris

Insurance.

72.     Title 9-B M.R.S. § 416 (2007) also applies to Kennebunk Savings and its subsidiary,

Morris Insurance.  It provides:

> Notwithstanding any other provisions of law, a financial institution has the power
> to engage in any activity that financial institutions chartered by or otherwise
> subject to the jurisdiction of the Federal Government may be authorized to engage
> in by federal legislation or regulations issued pursuant to such legislation.  In the
> event any law of this State is preempted or declared invalid pursuant to applicable
> federal law, by a court of competent jurisdiction or by the responsible federal
> chartering authority with respect to any power that may be exercised by a
> financial institution chartered by or otherwise subject to the jurisdiction of the
> Federal Government, that law is invalid with respect to financial institutions
> authorized to do business in this State.  The superintendent may adopt rules to
> ensure that such powers are exercised in a safe and sound manner with adequate
> consumer protections.

73.     On May 18, 2007, William Clifford, Executive Vice President and Chief

Administrative Officer of TD Banknorth Insurance Agency, Inc., informed Eric Cioppa, then

Acting Superintendent of the Maine Bureau of Insurance, by letter, that the Waiting Period

Statute was preempted by GLBA and of TD Banknorth Insurance's intention to solicit TD Bank's

credit applicants for insurance products.  A true copy of this letter is attached as Exhibit A.

74.     On June 21, 2007, counsel for Mr. Cioppa responded by letter to Mr. Clifford's letter. Counsel for Mr. Cioppa advised that the Bureau of Insurance has no discretion in the enforcement of Maine statutes, such as the Waiting Period Statute, and asked Mr. Clifford to postpone solicitation of credit applicants for insurance.  A true copy of this letter is attached as Exhibit B.

75.     By letter dated August 2, 2007, counsel for Mr. Cioppa advised John Opperman, General Counsel for TD Bank, that any solicitation of credit applicants in disregard of the Waiting Period Statute would expose TD Banknorth Insurance to formal enforcement action.  A true copy of this letter is attached as Exhibit C.

76.     Formal or informal enforcement action undertaken by the Bureau of Insurance against the Insurance Agency Plaintiffs would require self-reporting in all states in which the Insurance Agency Plaintiffs are licensed, or incurring additional disciplinary actions in some of those states for the failure to do so.

77.     The prospect of an enforcement action would create serious potential consequences for the Plaintiffs and thus gives rise to a justiciable controversy in the view of the parties.

78.     A true copy of the "Banknorth Insurance Group Referral Procedure," dated November 7, 2002, is available as Exhibit D to docket entry number 20.

79.     A true copy of the opinion letter of the Office of the Comptroller of the Currency (the "OCC"), dated March 18, 2002, concerning Chapter 129 of the Acts of 1998 of Massachusetts, codified at MASS. GEN. L. ch. 167F, §2A (2002), downloaded from the OCC website, which copy is identical to the reprint found in the Federal Register at 67 Fed. Reg. 13405 *et seq.* (2002), is available as Exhibit E to docket entry number 20.

80.    A true copy of the opinion letter of the OCC, dated September 24, 2001, concerning the West Virginia Insurance Sales Consumer Protection Act, codified at W. VA. CODE §§ 33-11A-6, 33-11A-8 to 11, and 33-11A-13 and 14 (2000), downloaded from the OCC website, which copy is identical to the reprint found in the Federal Register at 66 Fed. Reg. 51502 *et seq.* (2001) is available as Exhibit F to docket entry number 20.

### Discussion

In 1996, in <u>Barnett Bank of Marion County, N.A. v. Nelson</u>, the Supreme Court considered whether an act of Congress authorizing national banks to sell insurance in small towns preempted a Florida law that prohibited banks from selling certain kinds of insurance.  517 U.S. 25, 27-29 (1996).  The Court held that the act preempted the Florida law because it was clear from the act that Congress intended to excise its authority to override state law insofar as the federal and state statutes were in "irreconcilable conflict" and Congress had not conditioned, qualified, or limited the power given to national banks to sell insurance in small towns as depending upon state acquiescence.  <u>Id.</u> at 28, 30-32.   The Court rejected an argument that the anti-preemption rule set forth in the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), which preserves state authority to regulate the business of insurance absent a congressional act specifically relating to insurance, overrode ordinary preemption principles, because the Court concluded that the federal act in question clearly related to insurance and, therefore, rendered McCarran-Ferguson inapplicable.  <u>Id.</u> at 37-39.  The Court clearly held that ordinary preemption principles applied and that the states can only regulate national banks when doing so does not "prevent or significantly interfere with" the bank's exercise of the "powers" expressly conferred by Congress.  <u>Id.</u> at 33.

In the wake of the Barnett Bank opinion, Congress passed the act at issue in this case, the Gramm-Leach-Bliley Act of 1999, 15 U.S.C. §§ 6701 *et seq.* (Supp. 2008) ("the GLBA"). The GLBA provides, in its initial paragraph, that the McCarran-Ferguson Act "remains the law of the United States" with respect to state regulation of the business of insurance. Id. § 6701(a). Thereafter, however, the GLBA provides for preemption of certain state insurance regulations, as follows:

**(d)  Activities**

 **(1)  In general.**

Except as provided in paragraph (3),[1] and except with respect to insurance sales, solicitation, and cross marketing activities, which shall be governed by paragraph (2), no State may, by statute, regulation, order, interpretation, or other action, prevent or restrict a depository institution or an affiliate thereof from engaging directly or indirectly, either by itself or in conjunction with an affiliate, or any other person, in any activity authorized or permitted under this Act and the amendments made by this Act.

 **(2) Insurance sales**

 **(A) In general**

In accordance with the legal standards for preemption set forth in the decision of the Supreme Court of the United States in Barnett Bank of Marion County N.A. v. Nelson, 517 U.S. 25 (1996), no State may, by statute, regulation, order, interpretation, or other action, *prevent or significantly interfere with the ability of a depository institution, or an affiliate thereof, to engage*, directly or indirectly, either by itself or in conjunction with an affiliate or any other person, *in any insurance sales, solicitation, or crossmarketing activity*.

Id. § 6701(d) (emphasis added).  These general provisions establish that the ordinary rule of preemption applies to state regulation of the insurance sales, solicitation, or crossmarketing activity of national banks and their affiliates.  Furthermore, the plain language of the GLBA provides that the ordinary rule of preemption turns on whether or not the state regulation will

---

1       Paragraph 3 does not apply in this case because it applies to state regulation that does "not relate to or directly or indirectly regulate insurance sales, solicitations, or cross marketing activities."  15 U.S.C. § 6701(d)(3)(C).

"prevent or significantly interfere with the ability" of a bank or its affiliate "to engage . . . in any insurance sales, solicitation, or crossmarketing activity."  Id. § 6701(d)(2)(A).  As a supplement to the general preemption rule of subsection (d), Congress expressly permitted states to impose a number of restrictions on the insurance activity of banks and their insurance company affiliates, including restrictions in addition to those expressly identified by Congress.  These expressly permitted regulations "refine" the general preemption provision because Congress provided that other state regulations may not be more burdensome than those expressed in the GLBA.  Bowler v. Hawke, 320 F.3d 59, 61 (1st Cir. 2003).  The material provisions are as follows:

> **(B) Certain State laws preserved**
>
> Notwithstanding subparagraph (A), a State may impose any of the following restrictions, or restrictions that are substantially the same as but no more burdensome or restrictive than those in each of the following clauses:
>
> > . . . .
>
> > (**viii**) Restrictions prohibiting the extension of credit or any product or service that is equivalent to an extension of credit . . . on the condition or requirement that the customer obtain insurance from a depository institution or an affiliate of a depository institution, or a particular insurer, agent, or broker, *other than a prohibition that would prevent any such depository institution or affiliate—*
>
> > > . . .
>
> > > (**II**) *from informing a customer or prospective customer* that insurance is required in order to obtain a loan or credit, that loan or credit approval is contingent upon the procurement by the customer of acceptable insurance, or *that insurance is available from the depository institution or an affiliate of the depository institution*.
>
> > (**ix**) Restrictions requiring, when an application by a consumer for a loan or other extension of credit from a depository institution is pending, and insurance is offered or sold to the consumer or is required in connection with the loan or extension of credit by the depository institution or any affiliate thereof, *that a written disclosure be provided to the consumer or prospective customer indicating that the customer's choice of an insurance provider will not affect the credit decision or credit terms in any way,* except that the depository institution may impose reasonable requirements concerning the creditworthiness of the insurer and scope of coverage chosen.
>
> > > . . . .

Id. § 6701(d)(2)(B)(viii), (ix) (emphasis added).  In effect, with the GLBA Congress left room for the states to regulate the insurance sales, solicitation and crossmarketing activities of national banks and their affiliates, provided that no regulation prevents or substantially limits their ability to engage in those same activities, and provided that no regulations are any more burdensome than the state regulations expressly preserved in the GLBA. [2]  Id. § 6701(d) (A), (B).

The question presented is whether a certain provision of the Maine Insurance Code, dubbed the "Waiting Period Statute" by the parties, exceeds the preemptive restrictions of the GLBA.  That question is postured for a determination based on dispositive motions made on a stipulated factual record.  Thus the Court need not engage in extensive fact finding in order to dispose of this case.[3]

The Waiting Period Statute provides:

### § 2168-B.  Solicitation or negotiation involving purchasers or borrowers

A licensed agent or broker affiliated with a lender or creditor may not solicit an application for an insurance contract in connection with the extension of credit or negotiate such a contract from a purchaser or borrower whom the agent or broker knows, or should have known, has applied to receive an extension of credit from that lender or creditor until such time as the creditor or lender has provided by hand or sent written notice to the purchaser or borrower of its action on the application or has documented in writing in the lender's or creditor's records its action on the application.  This section does not limit the ability of a lender or creditor to do any of the following:

---

[2]     The GLBA further provides that nothing in section 6701 is meant "to create any inference with respect to any State statute, regulation, order interpretation, or other action that is not described in [section 6701(d)(2).]"  Id. § 6701(d)(2)(C).

[3]     In Bowler v. Hawke, the First Circuit observed:  "in deciding whether state laws are preempted by GLBA § [6701](d)(2), courts are going to have to make judgment calls about the extent to which the laws hinder the ability of depository institutions to engage in sales, solicitation, and cross-marketing activities, as a factual matter.  Such judgment calls will often be better made on an evidentiary record created in litigation in the trial court."  320 F.3d 59, 64 (1st Cir. 2003).  Here, the parties have stipulated to the facts, thereby providing the evidentiary record, and leaving the judgment call on the preemption question entirely up to the Court based on those stipulated facts and the permissible inferences that can be drawn from them.

19

> **1. Marketing Activities.** To engage at any time in marketing activities and solicitations for the sale of insurance, including through the mail or by telephone, that are not specifically directed toward purchasers or borrowers who have applied to receive an extension of credit.
>
> . . . .

24-A M.R.S. § 2168-B. By operation of the Waiting Period Statute, a national bank and its affiliated insurance company may not legally target a loan applicant with insurance solicitation while a loan application is pending, but must wait until the lender has documented its decision on the loan application. Thus, neither the banks nor their affiliated insurance companies may target market (or crossmarket) the insurance companies' insurance products to an applicant based on their knowledge of the pending application until after the application is approved and the loan is pending closure.

## A. Preemption

The plaintiff banks and affiliated insurance companies contend that the Waiting Period Statute is preempted by the GLBA because it substantially limits their ability to crossmarket the affiliates' insurance products when they know that a bank customer will be in need of certain insurance products based on an application for credit to purchase a car or home. They contend that the waiting period restriction is unfair because it restricts their ability to market their insurance product at a time when the loan applicant "has the opportunity and the motive to obtain insurance elsewhere." (Pls.' Brief at 2, Doc. No. 25.) They maintain that the preemptive force of the GLBA is objectively apparent based on the simple fact that they are temporarily restricted in their solicitation and crossmarketing activity. (Id. at 3.) In their words, they are "deprived of a prime opportunity to cross-market their insurance products and/or solicit customers for their insurance products and thus sell insurance." (Id. at 14; see also id. at 20-21.) They believe that

"[b]y the time the bank is allowed to solicit that customer . . . the customer is likely to have

obtained insurance elsewhere without ever having learned that the bank offered 'one-stop

shopping.'"  (Id.)  They also contend that this places them at a "distinct competitive

disadvantage" because their non-bank-affiliated competitors are not subject to a similar

restriction.  (Id. at 14-15.)  In support of their argument they rely on two opinion letters authored

by the Office of the Comptroller of the Currency of the United States ("the OCC") in regard to

other state regulatory schemes and on two decisions by federal courts striking down regulations

promulgated by the Massachusetts and West Virginia legislatures.  (Id.) [4]  On the factual front,

they offer the stipulated fact that targeted crossmarketing works well for them with respect to

"qualified retail referrals," where they experience a marketing success rate in excess of what they

experience in connection with mortgage insurance referrals.  (Id. at 18-19.)  The plaintiffs also

complain of administrative expense associated with their effort to prevent marketing or

solicitation from reaching loan applicants while the applications are pending.  (Id. at 20.)

Finally, in the plaintiffs' view, the Waiting Period Statute must be preempted because it is not

one of the restrictions expressly permitted in the GLBA and is impermissibly more burdensome

than those restrictions because it restricts crossmarketing that was "specifically contemplated" by

---

[4]        The plaintiffs also argue that the "prevent or substantially interfere with" standard stated in both Barnett
Bank and the GLBA is actually meant to "incorporate[] a number of preemption standards" (Pls.' Brief at 6), such as
"encroach[ment]," or "hamper," or "impair efficiency."  (Pls.' Brief at 8-9.)  Based on my reading of both the Barnett
Bank opinion and the GLBA, it seems plain that the standard is the "prevent or substantially interfere with"
standard, as informed by the "no more burdensome or restrictive" qualification articulated by Congress in relation to
the expressly permitted restrictions of subsection (d)(2)(B) of the GLBA.  I also agree entirely with the defendant
that the plaintiffs' argument over the applicable standard makes no sense based upon a deeper analysis of the
references made by the Court in its Barnett Bank opinion.  (See Def.'s Reply Brief at 1-6, Doc. No. 27.)  There is
also a fair amount of ink spilled over statements appearing in the legislative history of the GLBA.  It is apparent
from the parties' discussion of that material that the legislative history is divided on this question, with a senate
committee report that appears designed to water down the standard, followed by statements in the record by two
senators to the effect that the committee report mischaracterized existing supreme court precedent.  (See Pls.' Brief
at 10-11;  Def.'s Reply Brief at 4-5.)  My view, to paraphrase a recent Supreme Court opinion, is that, "[b]ecause the
legislative history is a wash in this case, we need not decide precisely how much weight it deserves in our analysis."
Richlin Sec. Serv. Co. v. Chertoff, 128 S. Ct. 2007, 2016 n.8 (2008).

Congress, based on its wording of the permitted restrictions.  (Id. at 21.)  In particular, they emphasize the wording of GLBA subsections (d)(2)(B)(viii) and (ix).  (Id. at 21-22.)

The defendant argues that the Waiting Period Statute is an important insurance regulation that is designed "to prevent loan applicants from being coerced into buying insurance . . . under the mistaken belief that doing so will improve their chances of obtaining the loan."  (Def.'s Brief at 1, Doc. No. 26.)  Stepping back some from the coercion allegation, the defendant describes the Waiting Period Statute as a regulation designed to take away some of the competitive advantage that banks would otherwise enjoy over competitors in the insurance market who are not affiliated with banks.  (Id. at 17;  Def.'s Reply at 9 & n.9, Doc. No. 27.)  In her initial brief, the defendant maintains that the question of preemption is "primarily a factual one" (Def.'s Brief at 1) and that the evidence presented in the stipulated record is insufficient to support a finding of significant interference with insurance *sales* (id. at 2 & 12).  In reply, she argues that the factual record is not sufficiently developed for the Court to entertain the precise degree of "the impact of the law on the bank's operations," thereby extending her argument to crossmarketing activity.[5]  (Def.'s Reply at 7.)  Central to the defendant's argument is the fact that the Waiting Period Statute does not interfere with general advertising or solicitation, only with targeted marketing of loan applicants, and only for the limited period of time until the bank records a decision on the loan application.  (Def.'s Brief at 2-3.)  In the defendant's view, certain statements offered by the TD Bank plaintiffs in other litigation undermine their ability to demonstrate significant interference. (Id. at 12-13.)  According to the defendant, the Court must presume that the State's regulation of insurance is proper and must construe the GLBA's preemption provision narrowly to preserve the

---

[5]        The defendant contends that the Waiting Period Statute "does not restrict the market, but, at most, might change how the plaintiffs sell to that market."  (Id. at 8 n.7.)

State's authority.  (<u>Id.</u> at 10-11.)  The defendant concedes that the Waiting Period Statute does not fall within any of the "safe harbors" set forth in the GLBA, section 6701, subsection (d)(2)(B).  (<u>Id.</u> at 5 n.2.)

Based on my review, I conclude that the Waiting Period Statute prevents or significantly interferes with the plaintiffs' ability to engage in insurance crossmarketing activity, even though the stipulated record is not sufficient to demonstrate the detrimental impact of the Waiting Period Statute in terms of actual lost sales.  Before explaining the basis for that conclusion, I pause to address the parties' dispute over "presumptions" and over the relevance of the OCC letter rulings referenced in the stipulated facts.

### 1.   *The presumption against preemption of traditional state regulation*

According to the defendant, the Court must presume that the Waiting Period Statute is not preempted by the GLBA.  She argues that the presumption requires a strict construction of the GLBA preemption provision and that the Court must find that Congress's intention to preempt regulations like the Waiting Period Statute is made "clear and manifest" by the GLBA. (Def.'s Brief at 10-11.)  For their part, the plaintiffs assert that there is a "presumption that state laws restricting a national bank's powers to solicit insurance customers or cross-market or sell insurance is ordinarily preempted."  (Pl.'s Brief at 10;  <u>see</u> <u>also</u> <u>id.</u> at 25-26.)

As the defendant posits, there is a presumption against preemption when a claim of preemption is based on a conflict between federal and state law.  <u>New York v. Fed. Energy Regulatory Comm'n</u>, 535 U.S. 1, 18 (2002).  "In such a situation, the Court starts with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress."  <u>Id.</u> (citations and internal quotation marks omitted).  However, the difficulty with respect to the defendant's presumption argument in this

case is that preemption is not merely implied by the existence of conflicting federal and state law. To the contrary, preemption of certain state regulation is expressly asserted in the language of the GLBA. Consequently, so long as that language is sufficient to resolve the matter of preemption, the Court need not delve into a conflict preemption analysis. CSX Transp. v. Easterwood, 507 U.S. 658, 664 (1993) ("Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue. If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.") (citation omitted); see also Geier v. Am. Honda Motor Co., 529 U.S. 861, 869-70 (2000) (holding that a statute or federal regulation may give rise to conflict preemption even where an express preemption provision does not reach the state regulation in question); .

### 2. *OCC letter rulings*

The plaintiffs support their position with citation to a letter ruling issued by the Office of the Comptroller of the Currency, at the request of bank entities, concerning the Massachusetts regulations at issue in the Bowler matters, and another letter concerning the West Virginia Insurance Sales Consumer Protection Act. (See Joint Stipulated Record Exs. E & F, Doc. Nos. 20-6, 20-7.) The plaintiffs contend that the Court should give deference to the views expressed by the OCC in its letters. (Pls.' Brief at 22-25.) In opposition, the defendant argues that administrative deference has no place here because the "GLBA's preemption provision is clear and unambiguous," so that nothing stated by the OCC can be relied upon to dilute the preemption language of the GLBA. (Def.'s Reply at 10.) I agree with the defendant that there is no reason for the Court to defer to the OCC's characterization of the GLBA's preemption standard because that standard is clearly stated by Congress. However, the OCC opinion with respect to the West

Virginia regulation includes a discussion of a waiting period very similar to the one set out in Maine's Waiting Period Statute.  (Doc. No. 20-7.)  Insofar as Congress implicitly gave the OCC a measure of deference in relation to GLBA preemption issues arising out of state regulation predating September 3, 1998—which includes the Waiting Period Statute, enacted in 1997—it is appropriate for the Court to consider the persuasive force of the OCC's assessment of that similar preemption dispute.  See Cline v. Hawke, 51 Fed. Appx. 392, 395-96 (4th Cir. 2002) ("unpublished");  15 U.S.C. §§ 6701(d)(2)(C)(i), 6714(e).  I have not reproduced the OCC's discussion here.  Suffice it to say that the OCC concluded that a regulation preventing crossmarketing until after approval of a loan is preempted because it "substantively affects the bank's ability to solicit and sell insurance products," such as by requiring banks to remove from mass mailing lists individuals with loans pending before the bank—a measure that does not appear to be required by the Maine Waiting Period Statute—or by preventing banks from offering "one-stop-shopping" to their customers.  (Doc. No. 20-7 at 25-26.)

### 3. The Waiting Period Statute prevents, or significantly interferes with, the plaintiffs' ability to engage in insurance crossmarketing activity.

The stipulated record does not persuasively present a picture that the Waiting Period Statute significantly interferes with insurance sales, in the sense of actually reducing the volume of insurance sales realized by the plaintiffs' insurance solicitation and crossmarketing activity. Although the stipulated facts reflect that the TD Bank plaintiffs have a lower "success rate" with solicitation activity that targets mortgage loan applicants in conformity with the Waiting Period Statute, as compared with their success on "qualified retail referrals," it is apparent that this is a comparison of apples to oranges.  The qualified retail referral is a person who has specifically requested insurance information from TD Bank, which tends to explain why the success rate for

25

insurance solicitation addressed to them is more successful.  The evidence pertaining to auto insurance is also unhelpful to the plaintiffs on the issue of whether the Waiting Period Statute has a significant negative impact on insurance sales volume.  Nevertheless, it is plain that the Waiting Period Statute prevents or significantly interferes with the plaintiffs' ability to engage in insurance crossmarketing activity.[6]

The stipulated record reflects that the Waiting Period Statute prevents the plaintiffs from engaging in a subset of insurance solicitation or crossmarketing activity that targets loan applicants, and that the plaintiffs would otherwise be able to put in place business practices that would take practical advantage of the fact that many loan applicants will require insurance products that the banks or their affiliates can readily provide.  In other words, but for the Waiting Period Statute, the plaintiffs would be able to "crossmarket" insurance products at the same time as they market loan products.  Not only does the Waiting Period Statute prevent the plaintiffs from marketing these two lines of products at the same time, it also prevents the plaintiffs from crossmarketing insurance products for the entire period of time that a loan application is pending approval, generally in excess of one week for mortgage applications, during which time the applicant is likely to be shopping for insurance products.  It is difficult to understand how this impediment is not a significant interference with crossmarketing activity.  The essence of the

---

[6]      In Mass. Bankers Assoc., Inc. v. Bowler, the court found that a more restrictive Massachusetts waiting period regulation was preempted by the GLBA because it would "foreclose" the bank plaintiffs' ability to sell insurance.  392 F. Supp. 2d 24, 28 (D. Mass. 2005).  Judge Zobel drew this conclusion based on a finding that "most retail loans require some form of insurance before the funds are advanced, [so that] most loan applicants will likely secure their insurance before their loan applications are approved." Id.  I am not persuaded in this case that the record establishes that most applicants secure insurance before a loan is approved, though it stands to reason that they would at least be seeking insurance during the relevant waiting period.  Nor am I persuaded that the waiting period imposed here would "foreclose" or "prevent" the sale of insurance products to loan applicants.  I conclude, instead, that it is better to treat the Waiting Period Statute as preventing or significantly interfering with crossmarketing activity rather than sales or solicitation activity in the general market.

crossmarketing concept would seem by logical inference to involve simultaneous marketing of associated products.

Congress intended with the GLBA to preempt regulations that prevent or significantly interfere with *the ability* of banks and their affiliates *to engage in* crossmarketing activity. Preventing the plaintiffs from engaging in crossmarketing during a window of time when crossmarketing would be most efficacious or advantageous "significantly interferes with" crossmarketing activity.[7]  Indeed, the restriction flatly prohibits certain crossmarketing activity when Congress has expressly barred the states from prohibiting the national banks from engaging in "any insurance . . . crossmarketing activity."  15 U.S.C. § 6701(d)(2)(A).  The restriction therefore triggers preemption.  This conclusion need not rest entirely on the plain language of subsection (d)(2)(A).  It is also evident from the subsection (d)(2)(B) discussion of preserved regulations that Congress understood pre-approval crossmarketing to be an activity protected by the GLBA.  Specifically, in subsection (d)(2)(B)(viii)(II), Congress preserved regulations that prohibit lenders from conditioning loan approval on the purchase of insurance from the bank or a bank affiliate, but expressly excluded any prohibition that would prevent the bank "from informing a customer or prospective customer . . . that insurance is available" from the bank or an affiliate.  The natural implication of this language is that Congress understood that a bank or its affiliate can crossmarket insurance to an individual customer when that customer

---

[7]      I understand and share the defendant's frustration that the stipulated factual record does not demonstrate that the Waiting Period Statute significantly interferes with the plaintiffs' insurance sales or their general solicitation of insurance business.  I also share the defendant's view that there is nothing unfair about this regulation.  However, the stipulated record does demonstrate that the bank is prevented from *any* crossmarketing activity during the applicable time frame.  I do not know how to characterize that prohibition, except as a significant interference with crossmarketing.  If the GLBA were applicable only to sales and solicitation generally, I would find, on these stipulated facts, that the Waiting Period Statute did not significantly interfere with the banks' activities.  It is a further frustration that "crossmarketing" is not defined in the GLBA, but I conclude from the stipulated facts and the statutory language that the term incorporates target marketing aimed at loan applicants who will need insurance if their loan is approved.

applies for credit.  There would be no need for a regulation requiring such disclosure if a bank were not able to market the insurance product while a loan application was pending.  The Waiting Period Statute is more burdensome than what Congress preserved in this passage because the Waiting Period Statute effectively prevents the bank from telling a prospective customer, *e.g.*, a person seeking a loan, that insurance is available from the bank or an affiliate. Because the Waiting Period Statute is more burdensome than the restriction preserved in subsection (d)(2)(B)(viii)(II), it is preempted by operation of the language in subsection (d)(2)(B), which saves from preemption only those restrictions that are "no more burdensome or restrictive" than those that are expressly preserved.

The defendant believes that the Waiting Period Statute is nevertheless sound because it contains an exception that permits the banks and their affiliates to solicit insurance sales through general marketing activity that is not associated with any pending loan application.  However, it is implicit in the GLBA that banks and their affiliates are authorized to engage in crossmarketing activity with customers or potential customers who are presently applying for credit.  Though the term is not defined by Congress, the scenario of joint or connected marketing is the essence of "crossmarketing activity" as compared with general insurance solicitation activity.  Thus, in subsection (d)(2)(B)(ix) of the GLBA, Congress preserves state regulations that require a written disclosure to a credit applicant stating that the customer's choice of insurer "will not affect the credit decision or credit terms."  Such a disclosure would naturally be needed at the time of application or while an application process is pending, which further reinforces the concept that crossmarketing activity is primarily marketing activity that transpires when a customer applies for a loan or during the loan application process.  Although the Waiting Period Statute is not directed at the issue of disclosure, it is significantly more burdensome than the disclosure

regulation contemplated by Congress because the Waiting Period Statute effectively prohibits the bank or its affiliate from engaging in any crossmarketing activity with loan applicants, whereas a disclosure regulation would enable that activity provided only that a disclosure accompanied any marketing materials or other communications.  In this fashion the language of subsection (d)(2)(B)(viii) and (ix) reinforces the plain preemption language of subsection (d)(2)(A), which bars state regulatory activity that prevents or significantly interferes with the ability of a national bank or its affiliate to engage in any insurance crossmarketing activity.

**B.    General Invalidation of Federally-Preempted Regulations**

Plaintiffs Kennebunk Savings Bank and Morris Insurance Services are neither national banks nor affiliates of national banks and are therefore not protected by the GLBA.  However, Maine law pertaining to the powers and duties of financial institutions invalidates any Maine law or regulation that is "preempted or declared invalid pursuant to applicable federal law . . . with respect to financial institutions authorized to do business in this State."  9-B M.R.S. § 416.  The defendant concedes that, if the GLBA preempts the Waiting Period Statute, then the Waiting Period Statute "may not be applied against Kennebunk Savings or Morris Insurance" any more than it could be applied against a national bank or its affiliate.  (Def.'s Brief at 6.)  Because I have concluded that the Waiting Period Statute is preempted by the GLBA, I conclude that the Waiting Period Statute may not be enforced against state chartered banks and their affiliates, by operation of 9-B M.R.S. § 416.

**Conclusion**

I RECOMMEND that the Court GRANT the plaintiffs' motion for judgment on a stipulated record (Doc. No. 25) and DENY the defendant's competing motion for judgment (Doc. No. 26) and enter an appropriate declaratory judgment finding that Maine's Waiting Period

29

Statute is preempted by the GLBA as it pertains to national banks and their affiliates and further, that by operation of 9-B M.R.S. § 416, the Waiting Period Statute may not be enforced against state chartered banks and their affiliates as well.

The Motion for Oral Argument (Doc. No. 28) is DENIED at this time. The request may be renewed in conjunction with the filing of any objection to this recommended decision.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 1, 2008

30